Slip Op. 20-164

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **STARKIST CO.,** | |
| Plaintiff, | |
| v. | **Before: Timothy M. Reif, Judge** |
| **UNITED STATES,** | **Court No. 14-00068** |
| Defendant. | |

## <u>OPINION</u>

[Denying plaintiff's Rule 56 motion for summary judgment and granting defendant's Rule 56 cross-motion for summary judgment.]

Dated: <u>November 18, 2020</u>

<u>Michael E. Roll</u> and <u>Brett Ian Harris</u>, Roll & Harris LLP, for plaintiff.

<u>Alexander Vanderweide</u>, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C., for defendant United States.  With him on the brief was <u>Justin R. Miller</u>, Attorney-in-Charge, <u>Jeanne E. Davidson</u>, Director, and Ethan P. Davis, <u>Acting Assistant Attorney General</u>.  Of Counsel was <u>Sheryl A. French</u>, Office of the Assistant Chief Counsel, U.S. Customs and Border Protection.

Reif, Judge: Plaintiff StarKist Co. ("StarKist" or "plaintiff"), an importer of tuna fish products, challenges a decision by United States Customs and Border Protection ("Customs") to classify four tuna salad products under subheading 1604.14.10 of the Harmonized Tariff Schedule of the United States (HTSUS),[1] which covers prepared or

---

[1] All citations to the HTSUS, including Chapter Notes and General Notes, are to the 2013 edition.

preserved fish, specifically "[f]ish, whole or in pieces, but not minced . . . [I]n airtight containers: In oil," and carries a 35% *ad valorem* duty.

Customs liquidated the entries in question on different dates from February through May 2013, and StarKist filed two separate protests to challenge the tariff classification at liquidation.  On January 22, 2016, plaintiff filed a complaint regarding the appropriate classification of these products.  Plaintiff argues that the products at issue are correctly classified under subheading 1604.20.05, which covers "prepared meals" that are not "minced," and carries a 10% *ad valorem* duty.  Alternatively, plaintiff argues that the products are correctly classified under subheadings 1604.14.22 and 1604.14.30, which cover tuna that is not "minced" and not "in oil," and carry 6% and 12.5% *ad valorem* duties, respectively.  The question presented is which of these subheadings properly covers the subject merchandise.

## BACKGROUND

This dispute involves the classification of four StarKist tuna fish products.  Pl.'s Statement of Material Facts Not in Issue ¶¶ 1, 3-4 ("Pl. Stmt. Facts"); Def.'s Resp. to Pl.'s Statement of Material Facts Not in Issue ¶¶ 1, 3-4 ("Def. Resp. Pl. Stmt.").  The four products at issue are: Tuna Salad Chunk Light (Lunch-to-Go pouches); Tuna Salad Albacore (Lunch-to-Go pouches); Tuna Salad Albacore (24 retail pouches); and Tuna Salad Albacore (60 retail pouches).  The subject merchandise contains cooked tuna mixed with celery, water chestnuts and a starch-based dressing.  *Id.*  Tuna Salad Albacore contains albacore tuna and white meat mayo, while Tuna Salad Chunk Light contains non-albacore tuna and light meat mayo.  Pl. Stmt. Facts ¶¶ 3-4; Def. Resp. Pl.

Stmt. ¶¶ 3-4.  The subject merchandise is exported to the United States in two different

forms: as retail pouch packs, which contain individual pouches of tuna, or as Lunch-to-

Go kits, which include a tuna pouch and a mint, spoon, napkin and crackers.  Pl. Stmt.

Facts ¶ 2; Def. Resp. Pl. Stmt. ¶ 2.

     All four varieties of the subject merchandise undergo the same four steps in

manufacturing: (1) garnish preparation, (2) the dressing phase, (3) the tuna phase, and,

(4) the filling and finishing phase.  Pl. Stmt. Facts ¶ 5; Def. Resp. Pl. Stmt. ¶ 5.  During

the garnish preparation phase, celery and water chestnuts are hand mixed.  *Id.*  During

the dressing phase, a mayo base dressing and relish are hand mixed with the blended

celery and water chestnuts.  *Id.*  The white meat mayo and the light meat mayo, which

comprise the mayo base dressing for the Tuna Salad Albacore and the Tuna Salad

Chunk Light, respectively, are purchased as finished products from an entity unrelated

to StarKist.  Pl. Stmt. Facts ¶¶ 27, 30; Def. Resp. Pl. Stmt. ¶¶ 27, 30.  No additional oil

is added to either mayo base beyond its ingredients.  Pl. Stmt. Facts ¶ 30; Def. Resp.

Pl. Stmt. ¶ 30.  Both mayo base products contain approximately 12 to 13 percent

soybean oil.  *Id.* ¶¶ 28-29.[2]

     During the tuna phase, tuna is chopped to a thickness of 0.8-1.0 inches for the

Albacore, and 1.0-1.5 inches for the Chunk Light.  Pl. Stmt. Facts ¶¶ 21-22, 25; Def.

Resp. Pl. Stmt. ¶¶ 21-22, 25.  The chopped tuna is then hand mixed with the mayo base

---

[2] Plaintiff asserts that the light meat mayo base contains 12.18 percent soybean oil.
Defendant disagrees and posits that it contains 12.82 percent soybean oil.  Pl. Stmt.
Facts ¶ 29; Def. Resp. Pl. Stmt. ¶ 29.  The difference is immaterial for classification.

dressing, relish, celery, and water chestnuts.  *Id.* ¶¶ 5, 21, 24, 33.  More than 82% of

Tuna Salad Chunk Light contains fish meat with a surface area of less than 0.3 square

centimeters, and more than 58% of the Tuna Salad Albacore contains fish meat with a

surface area of less than 0.3 square centimeters.  *Id.* ¶¶ 34-35.  The mayo base

containing oil is added to the tuna during the hand mixing process.  Pl. Stmt. Facts ¶ 33;

Def. Resp. Pl. Stmt. ¶ 33.

Finally, in the filling and finishing phase, metal funnels are used to fill each

pouch with the mixture of tuna, celery, water chestnuts and dressing that is created

from the prior steps.  *Id.* ¶ 5.  No additional oil is added to the final phase of

packaging or to any stage of production.  *Id.* ¶¶ 5, 30, 33.  The parties generally

agree on the total percentage of oil by weight in each finished tuna product.  As a

result of the addition of the mayo base during the tuna phase, that is 4% for the

Tuna Salad Albacore and approximately 5% for the Tuna Salad Chunk Light.  *Id.* ¶¶

32-33.[3]

## STANDARD OF REVIEW

Customs' protests are reviewed *de novo* by the court.  28 U.S.C. § 2640(a)(1)

(2018).  This court has jurisdiction under 28 U.S.C. § 2640(a)(1) because plaintiff

---

[3] Because the parties dispute the oil content of the light meat mayo base, the parties'
calculations for the oil content of the Tuna Salad Chunk Light products as a whole also
differ slightly.  Plaintiff contends that the total percentage of oil by weight is 4.59% and
defendant argues that it is 4.83%.  Pl. Stmt. Facts ¶ 32; Def. Resp. Pl. Stmt. ¶ 32.  This
difference is immaterial for classification.

contests Customs' denial of plaintiff's protest over the proper classification of the

merchandise at issue.

Summary judgment is permitted when "there is no genuine dispute as to any

material fact . . . ."  USCIT R. 56(a).  The court must decide materiality by determining

whether any factual disputes are material to the resolution of the action.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 US. 242, 247-48 (1986).  In making this determination, "all

evidence must be viewed in the light most favorable to the nonmoving party, and all

reasonable factual inferences should be drawn in favor of the nonmoving party."

*Dairyland Power Coop. V. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citations

omitted).  Here, the court does not find any disputes as to material issues of fact, so

summary judgment is appropriate to resolve the dispute over the classification.

The court's review of classification cases is limited to the record before the court.

28 U.S.C. § 2640(a).  "The plaintiff has the burden of establishing that the government's

classification of the subject merchandise was incorrect . . . ."  *Lerner New York, Inc. v.*

*United States*, 908 F. Supp. 2d 1313, 1317-18 (CIT 2013).  But, "plaintiff does not bear

the burden of establishing the correct classification; instead, it is the court's independent

duty to arrive at the 'correct result' . . . ."  *Id. (*quotations in original) (citations omitted).

The determination of whether an imported item has been properly classified

involves a two-step analysis.  *Sports Graphics, Inc. v. United States*, 24 F.3d 1390,

1391 (Fed. Cir. 1994).  First, the court must "ascertain[] the proper meaning of specific

terms within the tariff provision," and, second, "determin[e] whether the merchandise at

issue comes within the description of such terms as properly construed."  *BenQ Am.*

*Corp. v. United States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011).  The first step is a

question of law, while the second is a question of fact.  *Pillowtex Corp. v. United States*,

171 F.3d 1370, 1373 (Fed. Cir. 1999).

## LEGAL FRAMEWORK

The General Rules of Interpretation ("GRIs") of the HTSUS govern the proper

classification of merchandise entering the United States.  The GRIs "are applied in

numerical order."  *ABB, Inc. v. United States*, 421 F.3d 1274, 1276 n. 4 (Fed. Cir. 2005).

GRI 1 states that "classification shall be determined according to the terms of the

headings and any relative section or chapter notes."  GRI 3(a) applies specifically to

items in a set put up for retail sale (such as the lunch-to-go pouches).  It states that

"when two or more headings each refer to part only of the materials or substances

contained in mixed or composite goods or to part only of the items in a set put up for

retail sale, those headings are to be regarded as equally specific in relation to those

goods, even if one of them gives a more complete or precise description of the goods."

According to GRI 3(b), "goods put up in sets for retail sale, which cannot be classified

by reference to 3(a), shall be classified as if they consisted of the material or component

which gives them their essential character."

Finally, GRI 6 states, "the classification of goods in the subheadings of a heading

shall be determined according to the terms of those subheadings and any related

subheading notes and, *mutatis mutandis*, to the above rules, on the understanding that

only subheadings at the same level are comparable."  Further, "the relative section,

chapter and subchapter notes also apply, unless the context otherwise requires."

The HTSUS has the force of statutory law.  *Aves. In Leather, Inc. v. United States*, 423 F.3d 1326, 1333 (Fed. Cir. 2005).  Absent contrary legislative intent, tariff terms are to be understood according to their common and commercial meanings. *Len–Ron Mfg. Co. v. United States*, 334 F.3d 1304, 1309 (Fed. Cir. 2003).  When interpreting a tariff term, the court may rely on its own understanding of the term and on secondary sources such as scientific authorities and dictionaries.  *North Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001).

Additional U.S. Notes to the HTSUS are also "considered to be statutory provisions of law for all purposes."  *Del Monte Corp. v. United States*, 730 F.3d 1352, 1355 (Fed. Cir. 2013) (internal quotations omitted) (citations omitted).  These are "legal notes that provide definitions or information on the scope of the pertinent provisions or set additional requirements for classification purposes . . . ."  *Id.*

The court may also refer to the Explanatory Notes to the Harmonized Commodity Description and Coding System, developed by the World Customs Organization (WCO) ("ENs").  ENs may guide the interpretation of a tariff term since they are "intended to clarify the scope of HTSUS subheadings and to offer guidance in their interpretation," even though the ENs are not controlling.  *Len–Ron Mfg. Co.*, 334 F.3d at 1309.  The ENs are "generally indicative of the proper interpretation of a tariff provision."  *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007).

## DISCUSSION

I.      **Competing Tariff Provisions**

Chapter 16 of the HTSUS covers "preparations of meat, of fish or of crustaceans, molluscs or other aquatic invertebrates."  In determining the classification of the subject merchandise, the parties agree that the products are appropriately classified under Heading 1604 of the HTSUS, which covers "[p]repared or preserved fish; caviar and caviar substitutes prepared from fish eggs."  However, the parties disagree on the proper subheading applicable to the subject merchandise. The subheadings under Heading 1604 can be separated into three categories. The first grouping, subheadings 1604.11 – 1604.19, is limited to "fish, whole or in pieces, but not minced."  The second, consisting of only 1604.20, covers "[o]ther prepared or preserved fish; prepared meals," which includes "minced" fish.  The third category, "caviar and other substitutes," covers subheadings 1604.31-32.

The "not minced" category is divided by type of fish, with tuna and skipjack covered by subheading 1604.14, a subheading that is further subdivided depending on whether the product is "in oil" (1604.14.10), "not in oil" (1604.14.22), or "other" (1604.14.30).  As such, the question of whether the product is "minced" is a threshold question.  Within HTSUS 1604.14, the question of whether the product is "in oil" follows if the product is determined to be "not minced."

Court No. 14-00068                                                                  Page 9

## II.      Positions of the Parties

### A.      Plaintiff

Plaintiff claims that the subject merchandise is correctly classified under

subheading 1604.20.05 as prepared meals that are "minced" and that the court need

not reach the question of whether it is in "in oil."[3]  Pl.'s Mem. in Supp. of Pl. Mot. for

Summ. J. ("Pl. Br.") at 17-18, 22-23.  *See* Am. Compl. ¶ 21.  Plaintiff argues against

classification in subheading 1604.14 on the basis that subheading 1604.14 covers tuna

that is "not minced."  According to plaintiff, tuna is "minced" when its production involves

chopping and cutting cooked tuna into small pieces, Pl. Br. at 19, and that process

accurately characterizes the production process for the subject merchandise.  *Id.*  The

HTSUS does not define the term "minced," so plaintiff introduces dictionary definitions

of the term to support the proposition that the subject merchandise is minced.  *Id.* at 18.

In the absence of a defined tariff term, plaintiff cites six dictionary definitions to

support what it deems as the "common and popular" meaning of the term "minced."  *Id.*

at 18-20.  Plaintiff argues that the dictionary definitions of "minced" fit the description of

the subject merchandise.  *Id.* at 19, 21.  The referenced dictionaries define "minced"

with the term "small," and Customs likewise describes the chopped tuna pieces as

"small."  *Id.*; Pl. Stmt. Facts ¶ 37.  Thus, plaintiff claims that this connection supports the

argument that the subject merchandise includes "minced" tuna.  Pl. Br. at 19-20.

Additionally, Plaintiff emphasizes that only two of the six dictionary definitions reference

size requirements and none of the dictionary definitions specifies a uniformity

requirement.  Pl.'s Opp. to Def.'s Cross-Mot. for Summ. J., at 8-9, 10-12.  Thus, plaintiff

argues that the term "minced" does not demand specific measurement requirements.
*Id.*

Further, plaintiff argues that because the subject merchandise is "minced," it
should be classified under subheading 1604.20.05.  Pl. Br. at 22-23.  Plaintiff claims that
the subject merchandise is correctly classified under subheading 1604.20.05 because
the minced tuna products constitute "prepared meals" that consist of more than 20
percent by weight of tuna, vegetables and sauce.  *Id.*  The Explanatory Notes to
Chapter 16 provide that "food preparations fall in this chapter provided that they contain
more than 20 percent by weight of . . . fish."  *Id.*  Given the record before the court,
plaintiff claims that the subject merchandise is correctly classified under 1604.20.05.

Alternatively, plaintiff argues that if the court concludes that the subject
merchandise is not "minced," then the subject merchandise should be classified under
subheading 1604.14.22 or 1604.14.33, rather than subheading 1604.14.10, because
the tuna is not "in oil."  Subheading 1604.14.10 requires that the tuna be packed "in oil."
Plaintiff's argument is that the subject merchandise *includes* oil, but it is not *packed* "in
oil."[4]  *Id*. at 23.  *See* Am. Compl. ¶ 24.  Plaintiff opposes classification under subheading
1604.14.10 on the basis that oil was used to prepare the subject merchandise, but that
it is not "packed in oil."  Pl. Br. at 28-29.  Plaintiff supports this assertion through
application of HTSUS Chapter 16 Additional U.S. Note 1, which provides that "for the
purposes of this chapter, the term 'in oil' means packed in oil or fat, or in added oil or fat
and other substances, whether such oil or fat was introduced at the time of packing or
prior thereto."  *Id.* at 23.

Plaintiff also relies on the distinction between preparation and packing made by the court in *Richter Bros.*, which held that oil used in the preparation phase alone does not render the product "packed in oil." *Richter Bros., Inc. v. United States*, 44 C.C.P.A. 128 (1957); Pl. Br. at 26-27.  The *Richter Bros.* court reasoned that this distinction gave effect to the revision of Paragraph 718(a) of the Tariff Act of 1930, which resulted in the insertion of the phrase "prepared or preserved in any manner" before "packed in oil." *Richter Bros.,* 44 C.C.P.A. at 131.  Plaintiff contends that the preparation phase includes not only cooking, but also mixing the cooked tuna with the oil-based mayonnaise dressing, since the mixing process occurs prior to packing.  Pl. Br. at 28. For this reason, based on *Richter Bros.*, the presence of oil in the product — resulting solely from "preparation," according to plaintiff — does not properly result in classification of the product as "in oil."

   **B.   Defendant**

Defendant claims that the subject merchandise is properly classified under subheading 1604.14.10, because it is comprised of tuna fish that is not "minced" and is packed "in oil." *See Def.'s Mem. in Supp. of Its Cross-Mot. for Summ. J. and Resp. in Opp'n to Pl.'s Mot. for Summ. J.* ("Def. Br.") at 6.  On this basis, defendant opposes plaintiff's motion and files a cross-motion for summary judgment.

Defendant argues that the fish is packed in oil because the "pre-cooked tuna pieces are mixed with oil-based mayonnaise dressings," which means that the tuna salad pouches are packed "in oil" for tariff purposes. *Id.* at 6.  Defendant cites case law and Additional U.S. Note 1 to Chapter 16 of the HTSUS to support its claim. *Id.*

Defendant notes that Additional Note 1 does not require a specific quantity or proportion of oil for fish to be considered packed "in oil"; Additional Note 1 does not limit when, how, or for what purpose oil is added; nor does it "distinguish between oil that is alone in a packing medium and oil that is mixed with other ingredients."  *Id.* at 10.  Defendant argues that two cases — *Strohmeyer & Arpe Co. v. United States*, 5 Ct. Cust. App. 527 (1917) and *Del Monte Corp. v. United States,* 885 F. Supp. 2d 1315, 1319-20 (CIT 2012), *aff'd*, 730 F.3d 1352 (Fed. Cir. 2013) — support the proposition that "any amount of oil introduced in a tuna salad mixture, base, dressing, packing medium or sauce, renders that tuna product packed 'in oil' for tariff purposes."  *Id.* at 10-11.

Further, defendant argues that a third case relied upon by plaintiff — *Richter Bros.* — should be distinguished, because the fish at issue in *Richter Bros.* was fried in oil and packaged in a brine that contained no oil.  *See id.* at 20-21.  In *Richter Bros.*, the Customs Court found that when no oil was used in the actual packing process and as much of the frying oil as possible was drained from the fish after frying, the product would not be considered "packed in oil."  Because the subject merchandise in this case is in fact packaged in a soybean oil-based mayonnaise dressing, defendant argues that the subject merchandise should be classified as "packed in oil."  *Id. a*t 11-12.

With respect to whether the fish is "minced," defendant argues that it is not "because the pieces of tuna in the pouches are not the product of a minced cut, nor of a minced size, shape, or texture."  *Id.* at 1.  The HTSUS does not define the term "minced," so defendant relies on dictionary definitions and culinary sources to rebut plaintiff's claim that the court should interpret "minced" simply as "very small."  *See id.* at

13, 17-20.  Defendant argues that the culinary and dictionary sources from which

plaintiff draws its definition of "minced" are properly understood as supporting

defendant's proposed classification, because these sources — collectively summarized

— describe a mince "as the smallest sized pieces that can be measurably cut — an

approximate, uniform 1/16th x 1/16th x 1/16th — and not chunky."  *Id.* at 19-20.

Defendant applies its definition of "minced" to the subject merchandise, which

defendant notes was analyzed by Customs' laboratory and found to contain pieces

spanning a wide range of sizes, from immeasurably small to twelve times the size of a

minced cut.  *Id.* at 14.  While "a portion of the measured tuna was ostensibly in the

approximate range of a mince size, a predominant characteristic of a mince are uniform

pieces cut to size."  *Id.* at 15.  Defendant argues that Customs' findings demonstrate

that the pieces are not uniformly cut, and that this lack of consistency suggests that the

tuna is not minced.  *See id.* at 15-16.  Further, defendant asserts that plaintiff's

production records show that StarKist does not *intend* for the tuna to be minced —

"rather, [plaintiff] intends for the tuna pieces to be chunky."  *Id.* at 6.  Defendant argues

that the production process is intended to produce tuna pieces that are chunky and vary

in size and shape, "not the uniform product of an exacting minced cut."  *Id.* at 16.

In addition to arguing that the fish has been packed in oil and that it is not minced

for HTSUS purposes, defendant also responds to plaintiff's argument for application of

subheading 1604.20 by noting that this subheading is a residual classification: it is

intended to cover instances in which another subheading does not more specifically

cover the merchandise in question.  *See id.* at 12-13.  Since the subject merchandise "is

specifically described by HTSUS subheading 1604.14 as pieces of fish, it cannot be classified in the residual "other" subheading of HTSUS, 1604.20." *Id.* at 13.

### III.    Classification of the Subject Merchandise

The subject merchandise is properly classified under HTSUS 1604.14.10 because the subject merchandise consists of "fish, whole or in pieces, but not minced" and is "in oil."  The products at issue are correctly described as "in pieces, but not minced" because, while consisting partially of very small pieces, they vary significantly in shape, size and texture.  The pieces are also not produced by a minced cut, but rather by a process that includes both chopping and hand-mixing, which indicates that even the small pieces are not truly minced.

The determination of whether a product is "in oil" depends on whether the oil was added during the preparation phase or afterwards, during the packing phase.  In this case, the oil was added to StarKist's products during the packing phase after the preparation of the tuna.  Therefore, the products are properly classified as "in oil."  The court begins by analyzing whether the subject merchandise is "minced" or not, and then turns to the question of whether it is packed "in oil."

### A.    Minced

Based on the interpretive guidance of GRI 1 and GRI 6, all of the subject merchandise at issue is properly classified under HTSUS 1604.14.10, which covers "fish, whole or in pieces, but not minced" that is "in oil."  The subheadings within Heading 1604 fit into three main categories: (1) "Fish, whole or in pieces, but not minced" (1604.11–19); (2) "Other prepared or preserved fish" (1604.20); and (3)

"Caviar" (1604.31–32).  The product is not caviar and "other" provisions are intended to

function as residual classifications.  *See, e.g.*, *Orlando Food Corp. v. United States*, 140

F.3d 1437, 1442 (Fed. Cir. 1998) (using an "other" sub-heading as a "catch-all"

provision, appropriate when other classifications are not satisfactory).  Therefore, the

threshold question in this case is whether the subject merchandise consists of "fish,

whole or in pieces, but not minced," such that classification under HTSUS 1604.14 is

proper.  Specifically, the question is whether the tuna, in its entirety, is properly

classified as minced.

The term "minced" is not defined under the HTSUS, so the court analyzes

several different factors to interpret the meaning of "minced" under the statute and

applies them to determine whether the tuna is correctly classified as minced.

Specifically, the court examines (1) whether the pieces, based on their size and physical

characteristics, collectively, should be considered "minced," and, (2) whether the tuna

pieces are the product of a minced cut.  Based on these factors, the court concludes

that the subject merchandise as a whole is properly categorized as "in pieces, but not

minced."

### 1.    The Size and Physical Characteristics of the Tuna Pieces Are Not Consistent with a "Mince"

The subject merchandise consists of various pieces of tuna that vary significantly

in size, shape and texture.  Customs Laboratory Report; Deposition of Luis Quinones

("Quinones Dep.").  The subject merchandise includes some tuna pieces equivalent in

size to a minced piece, as well as pieces substantially larger.  *See* Customs Laboratory

Report at 4; *see also* Quinones Dep. at 14, 22; Ex. 9 (showing histogram pages of Laboratory analysis).  The language of the tariff — specifically, the phrase "in pieces, but not minced" — suggests the possibility of small pieces, including pieces that are equivalent in size to a "minced piece."  The language does not, by its own terms, specifically exclude from "[f]ish, whole or in pieces, but not minced" the presence of very small pieces.  Thus, the fundamental character of the tuna still may be chunky, despite the incidental presence of very small pieces.

While this case does not implicate GRI 3(b) on the question of whether the tuna is minced,[4] the inquiry — determining which pieces of tuna form the essence of the subject merchandise — ultimately bears sufficient resemblance to a test of "essential character" such that an "essential character" analysis is informative here.  This Court has previously held that the essential character of an entry is "that attribute which strongly marks or serves to distinguish what it is.  Its essential character is that which is indispensable to the structure, core or condition of the article, i.e., what it is." *Oak Laminates D/O Oak Materials Group v. United States*, 8 CIT 175, 180, 628 F. Supp. 1577 (1984) (citing *United China & Glass Co. v. United States*, 293 F. Supp. 734, 61 Cust. Ct. 386, C.D. 3637, C.D. 3637 (1968)).  Applying this concept to the product at issue, the court must consider whether the minced pieces of the subject merchandise define the character of the subject merchandise.  Altogether, the pieces equivalent in

---

[4] To implicate GRI 3(b), the subject merchandise would have to be, *prima facie*, classifiable under two or more subheadings.  Here, the product must either be minced or not minced; the product as a whole may not be classified as both.

size to a mince do not predominate to such an extent that they "distinguish what it is."

*See id.*

      Plaintiff and defendant propose different formulas to determine the precise

meaning of "minced" under the statute.  Neither formula provides a basis for the court to

find that the subject merchandise as a whole should be considered minced.  Plaintiff's

preferred definition for minced "includes food products that have been chopped or cut

into very small pieces with a surface area of 1/16 of an inch or less."  Pl. Br. at 22.

Defendant favors a definition that emphasizes uniformity of texture and shape.   Def. Br.

at 13.  For defendant, "[a] mince is not just tiny or very small pieces, but the smallest

sized pieces that can be measurably cut . . . ."  Def. Br. at 13.

      Neither plaintiff's nor defendant's framework provides a basis on which the court

may conclude that minced pieces define the character of the subject merchandise.

According to plaintiff, through its formula, "significantly more than 82% of one product

[Tuna Salad Chunk Light] has the requisite surface area to meet the requirement of

"minced" and "significantly more than 58%" of the other product [Tuna Salad Albacore]

contains the requisite surface area.  Pl. Br. at 21.  Even these proportions, however, do

not meet the plaintiff's own definition of minced, which states that food products must

have been chopped or cut into pieces "with a surface area of 1/16 of an inch or less."

Pl. Br. at 22 (emphasis supplied).  Plaintiff's definition of a minced cut suggests that

there is a limit to the size — measured by surface area — of what constitutes a

"minced" piece, and as defendant notes, some of the pieces are as much as twelve

times that size.  *See* Customs Laboratory Reports; Quinones Dep.  While some of the

pieces are the size of a "mince," according to plaintiff's own definition, the variation in

the surface area of the pieces shows that the subject merchandise's character as a

whole should not be considered minced because it contains pieces that are varied in

size and shape.

　　　The subject merchandise also does not meet defendant's definition of minced.

Even without specific measurements to define a "mince," the wide range of piece sizes

and lack of uniformity contribute to the conclusion that the product is not minced.

Significantly, these larger pieces impart the fundamental character of the tuna as a

whole, which is comprised of pieces of varying sizes, lacks uniformity and contains

chunks.  *See* Laboratory Photos.  Indeed, as noted above, some of the pieces are

substantially larger than others, and the overall consistency is "chunky."  *See*

Laboratory Reports; Quinones Dep.  A mince, according to both parties' definitions, is

small and relatively uniform in size, which suggests that a mince is not chunky in texture

or shape.  However, in StarKist's products, the presence of certain tuna pieces

equivalent in size to minced tuna is purely incidental; the defining character is more

accurately described as chunky, with pieces of varying size.  One variety of the products

at issue is even marketed as "Tuna Salad *Chunk* Light."  (Emphasis supplied).  As such,

"minced" does not properly characterize the subject merchandise as a whole, no matter

which definition is used.

## 2.　　The Tuna Pieces Are Not the Product of a Minced Cut

　　　The tuna here is not the product of a minced cut, which further compels

classification as "in pieces, but not minced."  The tariff language — specifically, the use

of the verb form of "minced" rather than the noun "mince" — suggests that the process by which the pieces are created is critical to determining whether they fall within the meaning of the provision.

Both plaintiff's and defendant's definitions of "minced" involve consideration of not only the *size* of the pieces but also the *process* by which StarKist cuts or chops the tuna to produce those small pieces.  As noted above, defendant's definition states that "[a] mince is not just tiny or very small pieces, but the smallest sized pieces that can be measurably cut . . . ."  Def. Br. At 13.  In other words, a mince is the product of cutting pieces as small as they can be cut.  Plaintiff's definition "includes food products that have been chopped or cut into very small pieces with a surface area of 1/16 of an inch or less."  Pl. Br. at 22.  This definition is even more explicit that cutting or chopping must serve as the method that produces the small pieces; the process of cutting is as integral to this definition as the small size of the resulting pieces.  Thus, based on both definitions, the small pieces of a minced cut are the product of a purposeful process that involves cutting or chopping.  Taking into account the size, shape and texture characteristics of what constitute minced pieces as well as the process by which they are produced, the court concludes that mincing may be defined as cutting or chopping into very small pieces.

While StarKist's production process involves some chopping, Morales Decl. ¶¶ 30-34; Exhibits C and D, ECF No. 60, its process for producing the tuna pieces differs sharply from mincing.  Here, for both the Albacore and the Chunk Light tuna, cooked tuna loins are passed through a chopper with four blades, set to achieve a thickness

chunk of 0.8-1.0 inches for Albacore and 1.0-1.5 inches for Chunk Light.   Morales Decl.

¶ 34.  An operator then hand-folds the tuna pieces and the mayonnaise-based dressing

for about 18-20 minutes, breaking up some of the larger pieces.  Morales Decl. ¶ 30 and

Exhibits C and D.  Thus, the pieces produced by the chopping are substantially larger

than the plaintiff's own "1/16 of an inch or less" definition of minced.  It is only when an

operator hand-blends the tuna with the dressing, after the chopping phase is already

complete, that the requisite "very small pieces" are produced.  The formation of these

pieces by hand-blending — rather than the chopping that characterizes production of a

minced cut — illustrates that the subject merchandise is not the product of a minced cut.

The products at issue in this case are properly classified as "not minced"

because they consist of pieces that are varied in size, some of which are significantly

larger than "very small" or "1/16 of an inch"; and because the small pieces are not the

product of a minced cut but of a hand-blending process.  As such, the fish is properly

classified under HTSUS 1604.14.10 because the subject merchandise consists of fish

that is "in pieces, but not minced."

### B.    In Oil

HTSUS Subheading 1604.14 contains three categories at the six-digit level:

1604.14.10 covers "tunas and skipjack, in airtight containers, *in oil*," 1604.14.22 covers

"tunas and skipjack, in airtight containers, *not in oil*," and 1604.14.30 covers "other:

albacore in foil or other flexible containers; other: in foil or other flexible containers;

other."  (Emphasis supplied).  The tuna products at issue are "in oil," so the correct

classification is 1604.14.10.

     **1.**     **Any Amount of Oil Is Sufficient to Render a Product Packed in Oil**

To qualify as "in oil" under HTSUS Heading 1604, Additional U.S. Note 1 clarifies that the subject merchandise must be "packed" in oil.  HTSUS Chapter 16, Additional Note 1.  However, the Note does not provide specific guidance as to how much oil must be present in the packing medium for fish to be packed "in oil."  In 2013, the Court of Appeals for the Federal Circuit ("Federal Circuit") provided guidance on this issue.  In *Del Monte Corp. v. United States*, the merchandise at issue was three varieties of tuna fillets and strips packed in a sauce.  730 F.3d 1352 (Fed. Cir. 2013).  The tuna was processed separately from the sauce, which was added only after the tuna was placed into its packaging.  *Id.* at 1353.  The sauce contained sunflower oil, which constituted a range between 3.1 and 12.4 percent of the sauce's weight across the three products. *Id*.  The court ruled that the products were properly classified as "in oil" because the tuna was not cooked in oil and the sauce was added after the cooking process:

> Del Monte's products were properly classified as "in oil" under subheading 1604.14.10 according to Additional U.S. Note 1.  It is undisputed that the tuna is not cooked in oil, that the tuna is placed in the packaging after being prepared without using any oil, and that a sauce containing some oil is then added to the pouch. That is sufficient to describe the Lemon Pepper and Lightly Seasoned varieties as tuna "packed . . . in added oil . . . and other substances" and thus to bring the goods within the scope of subheading 1604.14.10.

*Id.* at 1355.  The court interpreted Additional U.S. Note 1 to clarify that "goods are considered 'in oil' even if the liquid substance does not consist entirely of oil, and [Additional U.S. Note 1] sets no minimum threshold for the amount of oil that must be present."  *Id.*  (internal quotations in original).  The court relied on this

interpretation in holding that even a very small percentage of oil, between 0.62

and 2.48 percent of the total weight of the merchandise, was sufficient for the

merchandise to be classified as packed "in oil."  *See id.*

## 2.    A Product is Packed in Oil If the Oil is Added After the Preparation of the Product

Additional Note 1 to HTSUS Chapter 16 places no temporal requirements

on when the addition of oil occurs to render a product "in oil."  Note 1 also

specifically covers oil "introduced at the time of packing or prior thereto" and case

law further substantiates the plain language of the statute.  This Court's

predecessor, the United States Customs Court, first had occasion to interpret the

term "in oil" in 1915, when that court held that a fish product that contained oil

was properly classified as "in oil" without regard to whether the oil originated from

the cooking process or the sauce.  *Strohmeyer & Arpe Co.*, 5 U.S. Cust. App. at

527.  In *Strohmeyer,* the plaintiff manufactured a fish product that was both fried

in oil and packed in a tomato sauce that contained oil.  *Id.*  The final product

contained approximately 5.7 percent oil, with an indeterminate small share that

originated from the frying oil.  The court held that it did not matter how the oil

came to be present in the tomato sauce — the mere presence of oil in the

packing medium (i.e., the tomato sauce) was sufficient for the merchandise to be

considered "packed" in oil.  *Id.*

Over 40 years later, the court qualified its holding in *Strohmeyer* and determined

that a clear distinction exists between the preparation and packing stages for the

purposes of the tariff provision.  In *Richter Bros.*, the fish product was fried in oil but not

mixed with any dressing that itself contained oil.  44 C.C.P.A. at 128.  "It appears that

whatever oil was contained in the tins in which the herring were packed, if indeed there

was any, consisted of the natural oil of the fish, plus any residue from the herring oil and

tallow in which the fish were fried."  *Id.* at 129.  The court cited revisions to Paragraph

718(a) of the Tariff Act of 1930, which resulted in the addition of the phrase "prepared or

preserved in any manner" before "packed in oil."  *Id.* at 130.  The court interpreted the

revision as clarifying that the provision does not include fish products in which no oil

was added after the fish was "prepared or preserved."  *Id.*  The court relied on this

interpretation in holding that fish, which was fried in oil, drained, and then packed in a

liquid without oil, was not "packed in oil" because "no oil whatever [*sic*] was used in the

actual packing process."  *Id*. at 131.  The key contribution of the *Richter Bros.* court to

the precedent of *Strohmeyer* is the distinction between oil added during the preparation

stage and oil added during the packing stage.  That distinction results in the implication

that the preparation stage ends after cooking.

The summation of these prior cases is that if the fish is cooked in oil and no oil is

present in the dressing (as in *Richter Bros.*) then the fish cannot be said to be "packed"

in oil for HTSUS purposes.  But if the fish is mixed with a dressing or sauce that

contains oil — as in *Strohmeyer* and *Del Monte* — then it is considered "packed" in oil,

regardless of the cooking method.  Therefore, *Richter Bros.* and *Del Monte* stand for the

proposition that the addition of oil after the fish is prepared (cooked) renders the fish "in

oil."  There is a window of time — which begins after the fish is cooked and ends when

the package itself is closed — and the addition of any oil within this time period renders

the product "in oil."  The introduction of oil during the packing "or prior thereto," but after

cooking, renders the product "in oil."

### 3.      StarKist's Products are Packed In Oil

It is undisputed that StarKist's products contain enough oil to be considered "in

oil" for tariff classification purposes because any amount of oil is sufficient.  In addition,

the oil is added to StarKist's products after the preparation stage, so the products are

"packed" in oil.  Therefore, classification under HTSUS 1604.14.10 is proper.

### i.      StarKist's Products Contain Enough Oil To Be Classified as In Oil

The subject merchandise at issue falls squarely within HTSUS 1604.14.10 as fish

"in oil."  The tariff provision does not set a minimum oil content threshold.  Moreover, the

presence of oil in this case is not seriously in dispute, and the oil content of the subject

merchandise here is very similar to the oil content of the products at issue in *Del Monte*,

which were found to be "in oil."  *See* 730 F.3d at 1355.

The subject merchandise in this case contains tuna fish that is packed in a

mayonnaise dressing.  The parties agree that the white meat mayo base dressing used

in the Tuna Salad Albacore products contains 12.82 percent soybean oil by weight.  Pl.

Stmt. Facts ¶¶ 31-32; Def. Resp. Pl. Stmt. ¶¶ 31-32.  The parties disagree about the oil

content of the light meat mayo base dressing used in the Tuna Salad Chunk Light

products.  Pl. Stmt. Facts ¶ 29; Def. Resp. Pl. Stmt. ¶ 29.  Plaintiff contends the light

meat mayo base contains 12.18 percent oil by weight, while defendant argues the light

meat mayo base contains 12.82 percent oil by weight.  *Id.*  However, this slight

discrepancy is immaterial because any amount of oil is sufficient.  *See Del Monte*, 730

F.3d at 1355.

        In addition, the parties agree that the Tuna Salad Albacore products have a total

oil content of 4.42 percent by weight.  Pl. Stmt. Facts ¶ 32; Def. Resp. Pl. Stmt. ¶ 32.

The parties disagree about the total oil content of the Tuna Salad Chunk Light products

because of the disagreement about the oil content of the light meat mayo base

dressing, but the difference between the oil content levels is also immaterial because

any amount of oil is sufficient.  *See Del Monte* 730 F.3d at 1355; Pl. Stmt. Facts ¶ 32;

Def. Resp. Pl. Stmt. ¶ 32.  Therefore, the oil content of StarKist's finished products is

well beyond the threshold articulated by the court in *Del Monte* as sufficient to render

those products "in oil."  *See* 730 F.3d at 1355 (holding that a total oil content of only

0.62 percent by weight was enough for a product to be "in oil").

> **ii.     The Oil in StarKist's Products is Added After the Preparation Phase**

        The facts in this case are similar to *Del Monte* — tuna products that were not

fried or otherwise prepared in oil but were mixed with a dressing that contained oil.

Plaintiff attempts to distinguish the present case from *Del Monte* by contending that

StarKist's products are combined with the dressing in the preparation phase, before

they are placed in the packaging (the packing phase).  Pl. Br. at 28.  Plaintiff contends

that the merchandise in this case is more like that in *Richter Bros.* because here the

dressing containing oil was added during the preparation phase, as in *Richter Bros.* — not during the packing phase as with the products in *Del Monte*.  *Id.*

To reach this conclusion, plaintiff advances a novel argument that the preparation phase includes an additional step beyond cooking, namely, hand-mixing the tuna with the dressing containing oil.  *Id.*  It follows from plaintiff's argument that the preparation stage continues until the product is physically placed in its packaging (the packing phase).  *Id.*  However, plaintiff mistakenly conflates preparation of the finished product — tuna salad — with preparation of the fish itself.  The operative term in HTSUS Heading 1604 is "prepared or preserved fish."  The plain reading of this term is that "prepared or preserved" modifies the word "fish."  Plaintiff's argument that preparation refers instead to the product as a whole misconstrues the plain meaning of Heading 1604.  Plaintiff's interpretation also directly conflicts with the interpretation of the *Richter Bros*' court that the term "prepared or preserved in any manner" refers to the fish itself, not the entire manufacturing process of the finished product.

In addition, no prior case has held that the preparation phase includes the addition of other ingredients after cooking.  *See Richter Bros.*, 44 C.C.P.A. at 129 (finding that "after the fish had been cooked, as much of the oil as possible was drained off . . . the preceding steps relate to preparation, as distinct from packing"); *see Del Monte*, 730 F.3d at 1353 (finding that "the tuna is not cooked or prepared in oil and is processed separately from the sauce").  Plaintiff's reading of the statute here requires that the court interpret this provision in a way that belies the plain language of the statute and is inconsistent with prior case law.

StarKist carries out the preparation phase by cooking the tuna in a "pre-cooker" that does not use oil.  Pl. Stmt. Facts ¶ 12-15.  After the cooking phase, the tuna is chopped into smaller pieces and hand-mixed with the mayonnaise dressing, which contains oil.  Pl. Stmt. Facts ¶ 22.  The mixture is then physically placed in its packaging ("Filling and Finishing Phase").  Pl. Stmt. Facts ¶ 5.

During oral argument, plaintiff argued that the "or prior thereto" language "was inserted . . . to catch a situation where [*sic*] you have a pouch that you first fill with oil and then add fish.  That's certainly considered to be in oil, because the oil is part of the packing process."  Transcript of Oral Argument at 40.

Additional U.S. Note 1 makes clear that a product is properly considered to be "in oil" regardless of "whether such oil . . . was introduced at the time of packing *or prior thereto*."  (Emphasis supplied).  Plaintiff would like the court to draw an arbitrary distinction between the addition of oil before the fish is placed in its packaging and afterwards.  However, if the tuna in *Del Monte* was combined with the oil-based dressing in a separate container minutes before being placed in the pouch, plaintiff's interpretation would lead to the result that the fish is not "in oil" because the oil was not introduced within the confines of the packaging.

The distinction proffered by plaintiff is not supported either by the plain meaning of the Note, or the holdings in *Richter Bros.* and *Del Monte*.  The hypothetical adapted from *Del Monte* bears great similarity to the process used to make StarKist's products.  Classifying StarKist's products as "not in oil" simply because the oil was introduced in a

large container before the mixture was transferred to several smaller containers would

narrow without support the language of Note 1.

The products in this case are properly classified as "in oil" under HTSUS

1604.14.10.  Both the Chunk Light and Albacore products contain enough oil to be

considered "in oil."  In addition, classification under 1604.14.10 is proper because the oil

was added to the cooked fish as a separate dressing after preparation and prior to

packing.

### D.      Classification of the Lunch-To-Go-Pouches

As noted previously, some of the subject merchandise is imported in the form of

"Lunch-to-Go" kits.  These kits include crackers, mint, napkins and a spoon, in addition

to the tuna.  Pl. Stmt. Facts ¶ 2.  Therefore, the kits consist of materials that are properly

classifiable under five different HTSUS headings.  When goods are, *prima facie*,

classifiable under two or more headings, GRI 3 applies to the classification.  Under GRI

3(a), when "two or more headings each refer to part only of the materials or substances

contained in mixed or composite goods or to part only of the items in a set put up for

retail sale, those headings are to be regarded as equally specific in relation to those

goods."  That is the case here, as it is undisputed that the to-go pouches constitute "a

set put up for retail sale."  Pl. Br. 29-31.  Def. Br. 22-23.

Accordingly, the "Lunch-to-go" kits are classified according to GRI 3(b).  GRI 3(b)

specifies that the product "shall be classified as if they consisted of the material or

component which gives them their essential character."  Here again, it is undisputed

that of the retail kit components, it is the tuna that imparts its essential character.  Pl. Br.

29-31.  Def. Br. 22-23.  Therefore, the "Lunch-to-go" kits are properly classified under the same tariff provision as the tuna pouches: subheading 1604.14.10

## CONCLUSION

In the 2002 Walt Disney Feature Animation, *Lilo & Stitch*, Lilo, voiced by Daveigh Chase, arrives late to her hula dance class.[5]  Lilo's sister does not see a difference between feeding Pudge a peanut butter sandwich or a tuna sandwich — both, after all, are food.  Lilo, however, points out that while the sandwich has many components, it is, first and foremost, fish. The following conversation ensues between Lilo and her hula teacher, voiced by Kunewa Mook:

Hula Teacher: **"**Lilo, why are you all wet?"

Lilo: **"**It's sandwich day. Every Thursday I take Pudge the fish a peanut butter sand-wich . . ."

Hula Teacher: "`Pudge'" is a fish?"

Lilo: **"**And today we were out of peanut butter.  So I asked my sister what to give him, and she said `a tuna sandwich'. I can't give Pudge tuna!"

Lilo *(whispering)*: **"**Do you know what tuna *is*?"

Hula Teacher: "Fish?"

Lilo: *[hysterical]*  "It's fish! If I give Pudge tuna, I'd be an abomination!"

Just like Lilo in Lilo and Stitch, the court must nibble on the question of what constitutes the essence of an item.  While the subject merchandise consists of different

---

[5] Lilo & Stitch (Walt Disney Animation Studios 2002).

Court No. 14-00068                                                    Page 30

components it is, first and foremost, "prepared or preserved fish," which, viewed in its

entirety, is "not minced" and "in oil."

/s/     Timothy M. Reif    
Timothy M. Reif, Judge

Dated:  November 18, 2020     
       New York, New York